UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 25-13471-GAO

MARIA L. and NANCY M.,
on behalf of themselves and all others similarly situated,
and IMMIGRANT LEGAL RESOURCE CENTER,
Plaintiffs,

v.

MARKWAY MULLIN, in his official capacity as Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; TODD BLANCHE, in his official capacity as Attorney General of the United States; U.S. DEPARTMENT OF JUSTICE; SIRCE OWEN, in his official capacity as Acting Director of the Executive Office of Immigration Review; and EXECUTIVE OFFICE OF IMMIGRATION REVIEW,
Defendants.[1]

OPINION AND ORDER
September 30, 2026

O'TOOLE, D.J.

This putative class action involves the imposition of civil monetary penalties against noncitizens under a long-ignored provision of the Immigration and Nationality Act (the "INA") revived by the present executive administration. Although the INA authorizes certain fines when a noncitizen voluntarily fails to depart the country in accordance with a voluntary departure order, 8 U.S.C. § 1229c(d)(1), or willfully fails to depart the country following a final order of removal, id. § 1324d(a), immigration authorities had not imposed significant monetary penalties under the provisions until President Donald J. Trump's first and now second administrations. The complaint

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Sirce Owen is automatically substituted for Daren Margolin.

alleges that "tens of thousands of people" have been "exorbitantly fined for allegedly willfully or voluntarily failing to depart the country" with amounts potentially ranging up to 1.8 million dollars each. (Class Action Compl. for Vacatur, Declaratory Relief, and Injunctive Relief ("Compl.") ¶¶ 1, 58 (dkt. no. 1).) The plaintiffs challenge an Interim Final Rule promulgated in June 2025 to impose civil penalties under Sections 1229c and 1324d "swiftly and at [] scale," (id. ¶ 9 (quoting Imposition and Collection of Civil Penalties for Certain Immigration-Related Violations, 90 Fed. Reg. 27439, 27446 (June 27, 2025)) (alteration in original)), and related agency conduct in claimed violation of the Fifth, Seventh, and Eighth Amendments to the United States Constitution and the Administrative Procedure Act ("APA").

Presently at issue is the plaintiffs' Motion to Stay (dkt. no. 19).

## I. Statutory and Regulatory Background

### A. Applicable Civil Penalties

In 1996, Congress enacted the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA"), introducing immigration enforcement mechanisms into the INA against noncitizens who purportedly violated immigration laws. Relevant here are Sections 1229c and 1324d, which respectively authorize the government to assess civil monetary penalties when a noncitizen voluntarily fails to depart from the country in accordance with a voluntary departure order or willfully fails to depart the country following a final order of removal. Specifically, Section 1229c provides that if "an alien is permitted to depart voluntarily under this section and voluntarily fails to depart the United States within the time period specified," he "shall be subject to a civil penalty of not less than $1,000 and not more than $5,000."[2] 8 U.S.C. § 1229c(d)(1)(A).

[2] Now adjusted for inflation, the civil penalty imposed may be between $1,992 and $9,970. 90 Fed. Reg. at 27440; 8 C.F.R. § 280.53.

Similarly, Section 1324d provides for the assessment of a fine of "not more than $500 . . . for each day" a noncitizen subject to a final order of removal either (1) "willfully fails or refuses to" (a) "depart from the United States" under a final order of removal, (b) "make timely application in good faith for travel or other documents necessary" to leave, (c) "present for removal" as required, or (2) "conspires to or takes any action designed to prevent or hamper the alien's departure."[3] Id. § 1324d(a).

B. Enforcement of Civil Penalties

Enforcement of the civil penalties under Sections 1229c and 1324d has varied under different presidential administrations. Those penalties were largely unenforced until President Trump, then serving his first term, signed Executive Order 13768, titled "Enhancing Public Safety in the Interior of the United States." Exec. Order No. 13768, 82 Fed. Reg. 8799 (Jan. 30, 2017). Executive Order 13768 directed the Secretary of the Department of Homeland Security ("DHS") to issue guidance and promulgate regulations to ensure the assessment and collection of civil fines and penalties against noncitizens unlawfully present in the United States and persons who facilitate their unlawful presence.

Immigration and Customs Enforcement ("ICE") subsequently began assessing penalties under the relevant statutes in 2018. The plaintiffs claim that by the end of President Trump's first administration, ICE "retained twenty-six active civil penalties cases" and, of the "invoices assessed, ICE collected a total of $4,215." (Compl. ¶ 46.)

[3] Now adjusted for inflation the figure is $998 for each day that the noncitizen is in violation. 90 Fed. Reg. at 27440; 8 C.F.R. § 280.53.

In January 2021, President Joseph R. Biden revoked Executive Order 13768 by his own Executive Order 13993, titled "Revision of Civil Immigration Enforcement Policies and Procedures." See Exec. Order No. 13993, 86 Fed. Reg. 7051 (Jan. 20, 2021). DHS then rescinded the prior active decisions imposing fines and withdrew all active fine notices.

The pendulum shifted back on January 20, 2025, when President Trump, having commenced for his second term, issued Executive Order 14159, "Protecting the American People Against Invasion." Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025). Executive Order 14159 directed the DHS Secretary to take "all appropriate action to ensure the assessment and collection of all fines and penalties that [DHS] is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States." Id. at 8444–45. ICE thereafter resumed its assessment of civil penalties for violations of Sections 1229c and 1324d. By June 2025, ICE had reportedly initiated almost 10,000 Notices of Intent to Fine for failure to depart. Id. at 27442.

Further, in May 2025, President Trump issued a proclamation establishing "Project Homecoming," which would "present illegal aliens with a choice: either leave the United States voluntarily, with the support and financial assistance of the Federal Government, or remain and face the consequences." Proclamation No. 10935, 90 Fed. Reg. 20357 (May 9, 2025). The proclamation directed agencies to notify the public about the consequences to be imposed against those who failed to depart, including "removal, prosecution, incarceration, and fines as consistent with applicable law for immigration-related crimes; the garnishment of wages; and the confiscation of savings and personal property, including homes and vehicles." Id. at 20358.

C. Interim Final Rule

Until June 2025, the regulations that applied to most INA civil monetary penalties were found in 8 C.F.R. § 280. The procedures were developed largely in the 1950s for fines against airlines and carriers who violated the INA through the transportation of noncitizens into the United States. The regulations were not updated following the enactment of the IIRIRA.

That changed on June 27, 2025, when the Department of Justice ("DOJ") and DHS (together, the "Agencies") jointly promulgated the Interim Final Rule ("IFR") at issue in this action, titled "Imposition and Collection of Civil Penalties for Certain Immigration-Related Violations." 90 Fed. Reg. 27439. According to the IFR, the Agencies adopted the IFR to "streamlin[e] the process for imposing civil monetary penalties on aliens who have entered the United States unlawfully or have failed to depart after being ordered removed or granted voluntary departure" because the procedure in place "under 8 CFR part 280 was not designed with these penalties in mind." Id. at 27442. The changes were "intended to allow DHS to impose more civil penalties, more quickly, and in proportion to the sheer number of aliens who, in recent years, have unlawfully entered the United States and those who remain after a removal order or voluntary departure order." Id. Further, the Agencies stated that the prescribed efforts would "in turn, help deter future unlawful entries and encourage greater compliance with removal and voluntary departure orders consistent with this Administration's focus on securing the border and restoring integrity to our nation's immigration system." Id. The IFR added "a new 8 CFR part 281 to govern the process for civil monetary penalties for unlawful entry and failure-to-depart to address the above concerns and to better ensure that the process aligns with the straightforward nature of these penalties and the need for DHS to impose them quickly and at scale." Id. at 27446.

The revised procedures codified at 8 C.F.R. § 281 now govern assessment of civil penalties under Sections 1229c and 1324d.[4] These procedures include the issuance of final decisions on civil penalties rather than notices of intent to fine; service of such penalty decisions and orders by regular mail rather than by delivery in person or by certified mail; shortening the response period from thirty days to fifteen days; eliminating certain procedural provisions, including an in-person interview and certain appellate review; and authorizing DHS to reopen, reconsider, reduce, or rescind penalties at its discretion. See 90 Fed. Reg. at 27441–50. According to the plaintiffs, the "IFR took effect immediately and without notice and comment under the APA." (Compl. ¶ 75.)

## II. Background of the Case

The present putative class action is brought by two individual plaintiffs and the Immigrant Legal Resource Center ("ILRC"), a non-profit organization that submitted a public comment to the IFR in July 2025, against DHS, DOJ, ICE, Customs and Border Protection, Executive Office of Immigration Review, and various senior administrators in their official capacities. The two individual plaintiffs in this case are proceeding by pseudonyms as Maria L. and Nancy M.

According to the complaint, Maria L. is a Massachusetts resident "subject to a final order of removal" who has remained in the country "to pursue humanitarian immigration relief that would allow her to adjust her status and become a lawful permanent resident." (Compl. ¶ 18.) She claims that the defendants have imposed against her "hundreds of thousands of dollars in civil penalties under Section 1324d." (Id.) Nancy M. is a Florida resident "subject to a final order of removal" and is present in the country "with the permission of ICE . . . to pursue family-based

[4] Title 8 C.F.R. § 281 also governs civil penalties under a third provision, 8 U.S.C. § 1325(b), which provides for the assessment of civil penalties on noncitizens apprehended while entering or attempting to enter the United States at an improper time or place. That provision is not at issue in this suit.

immigration relief that would allow her to become a lawful permanent resident." (Id. ¶19.) She claims that the defendants have imposed against her approximately 1.8 million dollars in civil penalties under Section 1324d.

The plaintiffs challenge the defendants' purported efforts to impose monetary penalties under Sections 1324d and 1229c allegedly without meeting those statutes' prerequisites for imposing fines and/or without affording a civil jury trial. They also challenge the IFR, claiming that it was promulgated without the APA's required notice and comment procedures. Further, they take issue with what they call ICE's "Blanket Fine Policy" of imposing fines under Sections 1324d and 1229c by using new standardized, boilerplate forms without first individually assessing whether a noncitizen's failure to depart is "willful" under Section 1324d or "voluntary" under Section 1229c.

## III. Motion to Stay Agency Action

Plaintiffs move under 5 U.S.C. § 705 to stay the IFR, the allegedly unlawful practice of imposing fines without individualized consideration of the willfulness or voluntariness of a fine recipient's conduct under the so-called "Blanket Fine Policy," and all fines issued under the IFR and Blanket Fine Policy. Alternatively, they seek preliminary injunctive relief pursuant to 8 U.S.C. § 1324d and Rule 65 of the Federal Rules of Civil Procedure.

### A. Legal Standard

The APA permits courts to stay agency and to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. A stay under Section 705 of the APA is governed by the same standard applicable to the issuance of a preliminary injunction. See, e.g., New England Synod v. Dep't of Homeland Sec., 824 F. Supp. 3d 118, 139 (D. Mass. 2026); California v.

Kennedy, 802 F. Supp. 3d 273, 281 (D. Mass. 2025); Ass'n of Am. Univs., v. Dep't of Def., 792 F. Supp. 3d 143, 164 (D. Mass. 2025). Such relief is an "extraordinary and drastic remedy that is never awarded as of right." U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC, 121 F.4th 339, 347 (1st Cir. 2024) (quoting Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 8–9 (1st Cir. 2012)); accord Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (describing preliminary injunction as an "extraordinary remedy").

To obtain a preliminary injunction, a plaintiff must demonstrate that: "(1) it is 'likely to succeed on the merits'; (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in [its] favor' and (4) 'an injunction is in the public interest.'" New Jersey v. Trump, 131 F.4th 27, 33 (1st Cir. 2025) (alteration in original) (quoting Winter, 555 U.S. at 20). The party seeking the preliminary injunction bears the burden of establishing that all four factors weigh in its favor, but the "[t]he movant's likelihood of success on the merits weighs most heavily in the preliminary injunction calculus." Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020); see also New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

In assessing whether the movant has met its burden, the court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits." Rohm & Haas Elec. Materials, LLC v. Elec. Cirs. Supplies, Inc., 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010). "The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction." Bos. Taxi Owners Ass'n, Inc. v. City of Boston, 84 F. Supp. 3d 72, 78 (D. Mass. 2015).

## B. Discussion

### i. *Plaintiffs' Standing*

At the outset, the defendants—briefly and without citations to any case law beyond the generally applicable legal standard for standing—assert that the plaintiffs lack standing to challenge the penalties assessed under Section 1229c[5] because neither of them has been actually assessed penalties under the statute.[6] To have Article III standing, the plaintiff bears the burden of showing that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). "[T]he plaintiffs need only make a clear showing that they are likely to succeed in establishing Article III standing." Doe v. Trump, 157 F.4th 36, 47 (1st Cir. 2025) (emphasis in original); accord New Jersey, 131 F.4th at 33–34.

The defendants argue that the plaintiffs have not shown an injury that was incurred under Section 1229c because neither of the plaintiffs has been assessed actual penalties available under the statute. But the plaintiffs are not challenging the statutes themselves. They are claiming injury from the defendants' conduct in promulgating the IFR and its resulting policy that enormous fines may be assessed without individual consideration as is required by the relevant statutes. The IFR involves Sections 1229c and 1324d. The process envisioned by the IFR and formalized in 8 C.F.R. § 281 is the same. The form utilized to impose fines appears to be the same. The plaintiffs' asserted injuries—the imposition of crippling fines and the potential collateral consequences without individual consideration based on a rule that was promulgated without notice and comment—is

[5] The defendants do not contest the individual plaintiffs have standing to challenge the imposition of fines under Section 1324d.

[6] The defendants' separate contention that ILRC lacks standing is unnecessary to reach in light of this Court's decision that the individual named plaintiffs have standing. See Massachusetts v. EPA, 549 U.S. 497, 518 (2007).

likely to be redressed by a favorable judicial decision that vacates the IFR and prohibits the assessment of fines under the current policy.

As a result, the individual plaintiffs have made a plausible showing that they are likely to be able to establish each element of standing necessary to bring the motion for preliminary injunction. See New Jersey, 131 F.4th at 33–34.

*ii. Likelihood of Success on the Merits*

The plaintiffs argue that they are likely to succeed on the merits based on the following four arguments: (1) the Blanket Fine Policy is contrary to law (Count VI); (2) the Blanket Fine Policy is arbitrary and capricious (Count VII); (3) the IFR is arbitrary and capricious (Count V); and (4) IFR was promulgated unlawfully without notice and comment (Count IV). The plaintiffs have at this stage shown a likelihood of success on the merits that the IFR and its subsequent en masse imposition of civil penalties are contrary to law because the fines are apparently imposed without individual consideration of whether the purported conduct is either willful or voluntary. In addition, they have demonstrated they are likely to succeed in showing that the IFR was issued without customary notice and comment.

*(1) Contrary to Law*

Section 706(a) of the APA instructs reviewing courts to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The plaintiffs have made the requisite showing at this stage that the IFR and Blanket Fine Policy are not in accordance with the law because they effectively read the words "voluntarily" and "willfully" out of the relevant statutory provisions.

As described above, Section 1229c provides that if "an alien is permitted to depart voluntarily under this section and voluntarily fails to depart the United States within the time

period specified," he "shall be subject to" civil penalties. 8 U.S.C. § 1229c(d)(1)(A). Similarly, Section 1324d provides for the assessment of penalties for a noncitizen subject to a final order of removal who (1) "willfully fails or refuses to" (a) "depart from the United States" under the order, (b) "make timely application in good faith for travel or other documents necessary" to leave, or (c) "present for removal" as required," or (2) "conspires to or takes any action designed to prevent or hamper the alien's departure." 8 U.S.C. § 1324d(a). The statutes, therefore, effectively penalize conduct only where it is shown to be willful or voluntary.

Neither the IFR nor the Blanket Fine Policy appear to make individual assessments regarding the willfulness or voluntariness of the behavior prior to the assessment of fines under the relevant statutes. The IFR provides that when an individual remains in the country after a final order of removal or voluntary departure order, an inference of a violation will be made. 90 Fed. Reg. at 27453. Based on this inference, the defendants assess the penalties, and it is up to the recipient to challenge the assessment (again, within an abbreviated time frame and without the opportunity to request an in-person interview regarding the allegations). The IFR repeatedly asserts that the assessment of penalties is "straightforward" and "readily verifiable" with DHS's own documentary evidence. <u>See</u> 90 Fed. Reg. 27439–53 (repeating "straightforward" over twenty times).

The defendants claim that they make individual assessments in each case, but they do not provide relevant details or point to any actual examples in which they have considered noncitizens' individual circumstances and found that a failure to leave the country was not willful or voluntary. The forms assessing civil fines do not contain any specific allegations regarding why an

individual's conduct resulted in the penalty.[7] See, e.g., Ye v. U.S. Dep't of Homeland Sec., No. 26-cv-06417, 2026 WL 2584711, at *6 (N.D. Cal. Sept. 1, 2026) (noting DHS had not established willfulness under 8 C.F.R. 281.1(c)(1) where neither the plaintiff's Notice of Violation nor the Appeal Decision contained any "brief statement of the reasons for the decision," nor did they otherwise explain basis for finding of willfulness). Indeed, initiating nearly 10,000 notices for failure-to-depart civil monetary penalties between March and June 2025 belies an argument that each of those circumstances were individually evaluated for willfulness or voluntariness.[8]

There are circumstances in which a noncitizen might remain in the country following a removal order or voluntary departure order without meeting the statutory requirements for civil penalties. See, e.g., id. (determining that government's ability to establish that plaintiff refused to leave willfully under the statute was "uncertain at best and doubtful at worst" where she does not speak or read English, she was never informed in her own language of any obligation to depart or deadline to leave, she stayed to pursue her legal rights through the appeals process, and she does not know whether her home country would accept her return); cf. Berdiev v. Garland, 13 F.4th 1125, 1135 (10th Cir. 2021). The IFR itself acknowledges as much. See 90 Fed. Reg. at 27443. In this case, both named plaintiffs have remained in the country to pursue immigration relief that would allow them to obtain lawful status. For instance, when the defendants issued and affirmed

---

[7] The forms ICE previously used contained "blank spaces to allow the official issuing the fine to include individualized allegations regarding the alleged punishable conduct." (Compl. ¶ 43; accord Decl. of Ian Head ¶ 16 (dkt. no. 20-3).) Newer "boilerplate" forms contain boxes for the immigration officer to check with no further factual findings or evidence (Compl. ¶¶ 73–74; 99–101; Decl. of Ian Head ¶¶ 10–15; 17–19.)

[8] The declarations the plaintiffs seek to add to the record in their Motion to Supplement (dkt. no. 81) provide further support that the defendants are imposing fines without individualized consideration. Additionally, it appears that the defendants have now assessed over 65,000 penalties amounting to roughly $36 billion.

a fine of 1.82 million dollars against Nancy M. for her purportedly "willful" failure to depart, she was present in the country under an order of supervision. She has since been approved for an immigrant visa and was admitted as a lawful permanent resident. (Mot. for Leave to Suppl. the R. in Supp. of Pls.' Mot. to Stay Agency Action 1–2 (dkt. no. 97).)

Under the circumstances, the plaintiffs have demonstrated a likelihood of success in establishing that the civil penalties appear to be intended to be imposed without individual consideration and assessment of the willfulness or voluntariness of the behavior in violation of Sections 1229c and 1324d.

*(2) Promulgation without notice and comment*

The plaintiffs also argue that the IFR is unlawful because the defendants did not engage in notice and comment rulemaking before it took effect. The defendants do not dispute that they failed to follow the APA's notice and comment requirements, but they assert that two exceptions apply: the foreign affairs and procedural exceptions.

Under the APA, federal agencies ordinarily must issue a "[g]eneral notice of proposed rule making," usually by publication in the Federal Register and then allow "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b), (c). The agency "must consider and respond to significant comments," Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 96 (2015), and thirty days must pass before the promulgated final rule can go into effect, 5 U.S.C. § 553(d). Section 553's procedural requirements for rulemaking are subject to limited exemptions, including in relevant part, the so-called foreign affairs exception, id. § 553(a)(1), and procedural-rule exception, id. § 553(b)(A).

The defendants' argument regarding the foreign affairs exception fails. Under the foreign affairs exception, agencies may forgo the notice and comment period for agency rules involving a "foreign affairs function of the United States." Id. § 553(a)(1). Because immigration is necessarily intertwined with foreign affairs, "[c]ourts have specifically warned of the 'dangers of an expansive reading of the foreign affairs exception' in the immigration context." Roe v. Mayorkas, No. 22-cv-10808-ADB, 2023 WL 3466327, at *16 (D. Mass. May 12, 2023) (quoting City of New York v. Permanent Mission of India to the United Nations, 618 F.3d 172, 202 (2d Cir. 2010)). "Indeed, a capacious interpretation of § 553 would risk 'eliminating public participation in an entire area of administrative law.'" Mayor & City Council of Balt. v. Trump, 416 F. Supp. 3d 452, 510 (D. Md. 2019) (quoting Permanent Mission of India, 618 F.3d at 202 (cleaned up)). Although the First Circuit does not appear to have articulated a test for evaluating the application of the foreign affairs exception, other courts have held that it applies (1) where following APA procedures would "provoke definitely undesirable international consequences," E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 775–76 (9th Cir. 2018) (quoting Yassini v. Crosland, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980)); Rajah v. Mukasey, 544 F.3d 427, 437 (2d Cir. 2008), or (2) for rulemaking that directly involves "quintessential foreign affairs functions," Permanent Mission of India, 618 F.3d at 202; Cap. Area Immigrants' Rts. Coal. ("CAIR") v. Trump, 471 F. Supp. 3d 25, 53 (D.D.C. 2020) (applying dictionary definitions to determine that the "'foreign affairs function' encompasses activities or actions characteristic to the conduct of international relations" and therefore "a rule must clearly and directly involve activities or actions characteristic to the conduct of international relations"); see also Roe, 2023 WL 3466327, at *16.

The defendants do not make any argument that following the APA's procedures in this context would have provided undesirable international consequences and appear instead to argue

only that the rulemaking directly involves quintessential foreign affairs functions. They point to the fact that execution of removal and voluntary departure orders "requires close coordination with foreign governments, including confirming nationality, obtaining travel documents, and arranging travel." (Defs.' Opp'n to Pls.' Mot. to Stay Agency Action ("Opp'n Br.") at 10 (dkt. no. 32).) These tasks, however, only indirectly implicate international relations, if at all. The IFR alters regulations about civil penalties that apply to persons currently in the United States and involve the mechanisms by which those penalties can be imposed, appealed, and collected. It does not involve any foreign governments, foreign treaties, or any foreign action, even if it might have some sort of downstream effect on other countries. This is a far cry from the kinds of cases in which courts have found that the foreign affairs exception applies. See, e.g., Rajah, 544 F.3d at 437 (responding to attacks of September 11, 2001); Int'l Bhd. of Teamsters v. Pena, 17 F.3d 1478, 1486 (D.C. Cir. 1994) (rule implementing international agreement between the United States and Mexico); Malek-Marzban v. Immigr. & Naturalization Serv., 653 F.2d 113, 115–16 (4th Cir. 1981) (responding to the Iranian hostage crisis); see also Roe, 2023 WL 3466327, at *17 (finding the exception applied to changes in humanitarian parole for Afghan nationals because the "sudden withdrawal of U.S. troops from Afghanistan" was a "matter of great international consequence," "the closure of the U.S. Embassy implicated foreign diplomacy," and both "involve[d] core foreign policy functions").

Because the IFR does not involve activities characteristic of the conduct of international relations, the government has not demonstrated that the foreign affairs exception applies. See, e.g., CAIR, 471 F. Supp. 3d at 55.

The defendants have also failed to demonstrate that the so-called procedural rule exception applies. The APA's notice and comment procedures are not required for "rules of agency

organization, procedure, or practice." 5 U.S.C. § 553(b)(A). This exception involves rules that are "primarily directed toward improving the efficient and effective operations of an agency." AFL-CIO v. NLRB, 57 F.4th 1023, 1034 (D.C. Cir. 2023) (quoting Mendoza v. Perez, 754 F.3d 1002, 1023 (D.C. Cir. 2014)). "[T]he critical feature of a rule that satisfies the so-called procedural exception is that it covers agency actions that do not themselves alter the rights or interests of parties . . . ." Id. (first alteration in original) (quoting James V. Hurson Assocs., Inc. v. Glickman, 229 F.3d 277, 280 (D.C. Cir. 2000)); accord Presidents' All. on Higher Educ. & Immigr. v. Noem, 824 F. Supp. 3d 168, 202 (D. Mass. 2026). The exception therefore is aimed at "internal house-keeping measures" and, like the foreign affairs exception, is narrowly construed by courts. Presidents' All. on Higher Educ. & Immigr., 824 F. Supp. 3d at 202 (quoting AFL-CIO v. NLRB, 57 F.4th at 1034).

Here, portions of the IFR can be characterized as "internal house-keeping measures." For example, the IFR permits service of process by regular mail, rather than by personal service, which could be considered a change directed toward improving the "efficient and effective operations of an agency" without curtailing "the rights or interests of [the] parties." See AFL-CIO v. NLRB, 57 F.4th at 1034 (quoting Glickman, 229 F.3d at 280); see also JEM Broad. Co., Inc. v. FCC, 22 F.3d 320, 326–27 (D.C. Cir. 1994) (procedural rule exception applied to rule establishing fixed filing period for applications requesting FM channel use after FCC allotted almost 700 new commercial channels to help streamline agency's review process).

However, other provisions in the IFR are essentially at the substantive "end of a spectrum running from 'procedural' to 'substantive.'" See Lamoille Valley R. Co. v. ICC, 711 F.2d 295, 328 (D.C. Cir. 1983). Significantly, the IFR provides for the direct issuance of penalties without a notice of intent to fine. The direct issuance deprives noncitizens of pre-penalty notice and the

potential opportunity to prepare for the imposition of fines, particularly where the penalties—adopted in 1996—have apparently never been imposed to any significant degree. The IFR truncates the time period during which a recipient may appeal the imposition. Previously, a noncitizen had thirty days to appeal, but now a recipient of an order and decision has only fifteen days to appeal before it becomes final. That provision seems to be essentially punitive. The recipient must timely open his mail, decipher in English the somewhat technical language in the order, consider and plan his defense, obtain supporting documentary evidence, write a response, and mail the material within that short time period. The new framework does not provide for additional time to submit material, request an in-person interview, or request mitigation of a penalty. The time period to understand, prepare, and mail an appeal is so short that it potentially "foreclose[s] effective opportunity to make one's case." See id. As an example, unlike the right to amend a telecommunications application to use an FM channel, see JEM Broad. Co., Inc., 22 F.3d at 326–27, a noncitizen's only chance to contest ruinous civil penalties is sufficiently significant to require specific notice and comment.

For the foregoing reasons, the plaintiffs have shown a likelihood of success on the merits of their claim that the defendants violated the APA by failing to provide notice and comment.

*iii. Irreparable Harm*

The plaintiffs contend that they will suffer irreparable harm if a stay is not granted. Specifically, they allege that they have suffered irreparable harm from the imposition of "astronomical" fines with related adverse consequences and substantial deprivation without meaningful consideration of the voluntariness or willfulness of their failure to depart. (Pls.' Mem. of Law in Supp. of Pls.' Mot. to Stay Agency Action 18.)

The plaintiffs here face assessment and possible collection of enormous fines well beyond their capacity to pay. Maria L., a nail technician on a variable salary, was issued a significant fine in the hundreds of thousands. A victim of political violence in her home country, she reports that the fine has affected her health, increased her anxiety, caused depression, and led to her missing work for a month. (Decl. of Maria L., ¶¶ 3, 16, 19–21 (dkt. no. 20-1).) Nancy M. was fined over 1.8 million dollars. (Decl. of Nancy M., ¶ 22 (dkt. no. 20-2).) She is a laborer working over sixty hours a week with two jobs, and she reports feeling serious anxiety affecting her ability to sleep, eat, and live a normal life. (Id. ¶¶ 28, 31.) Given the amount of the fines, the plaintiffs face the possibility of garnishment of wages and bank accounts, seized assets such as vehicles and homes, IRS reports, federal collections suits, and adverse future admissibility determinations.[9] 90 Fed. Reg. at 20358; see also Compl. ¶¶ 113–24.

The government in response notes that the monetary fines can be recouped—if the plaintiffs win their suit, the Court may vacate the penalties or order appropriate relief setting them aside to restore the plaintiffs to their positions before the penalties were imposed.[10] However, this is not a typical commercial case in which "only money is at stake." (Opp'n Br. 17 (citing Foxboro Co. v. Arabian Am. Oil Co., 805 F.2d 34, 36 (1st Cir. 1986)).) The plaintiffs live in an economically precarious position even without the imposition of the government's exorbitant

[9] The supplemental declarations attached to the plaintiffs' Motion to Supplement (dkt. no. 81) provide details from additional fine recipients, e.g., collection lawsuits, seizure of joint tax refund, debt collector notices, credit score deflation, severe stress and anxiety, etc.

[10] The defendants also argue that the plaintiffs have failed to show irreparable harm because of the purported "delay" in bringing the instant motion. Other than their citation to Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 35 (1st Cir. 2011), a trademark infringement case involving a ten-year delay, the defendants do not cite any authority or otherwise attempt to quantify any specific amount of time which would undermine the plaintiffs' cries of urgency.

fines. Like the business plaintiffs in Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009), the assessment and collection of hundreds of thousands of dollars to over a million dollars would push the plaintiffs, a nail technician and laborer, into insolvency. They face the possible garnishment of their already modest wages, loss of any vehicles and homes, federal collections lawsuits, and other adverse collateral consequences. If they were ultimately successful in this suit, there is no indication that simply requiring the government to vacate their fine notices would—or even could, at that point—make the plaintiffs whole or return the circumstances to the status quo. See, e.g., Ye, 2026 WL 2584711, at *10 (describing "irreparable credit damage and the stress of impending financial instability" impacting plaintiff and plaintiff's family as "material irreparable harm").

*iv. Balance of Equities and Public Interest*

The final two factors, balance of equities and the public interest, "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). In support of their argument that these factors weigh in their favor, the plaintiffs, facing massive and possibly unlawful fines, point to the public's interest in ensuring that the government follows appropriate procedures and the law. The defendants counter, citing the harm they purportedly would face if they were prevented from effectuating the penalty statutes. See Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo, 18 F.4th 38, 47 (1st Cir. 2021). The prior statutes at issue are decades-old and the IFR followed the most recent iteration of contradictory, back-and-forth executive orders. Granting the stay would not prevent the defendants from imposing fines or pursuing the government's larger immigration goals. Rather, it would only require them to utilize the same procedures that governed the assessment of penalties prior to the IFR. Even if the collection of the fines were stayed pending the proceeding, the government could

collect them at a later date if the penalties were ultimately to be enforced. See, e.g., Ye, 2026 WL 2584711, at *11.

C. Conclusion

The plaintiffs have shown a likelihood of success on the merits, irreparable harm, and that the balance of equities and the public interest support preliminary relief. The Court shall issue a stay under Section 705 of the APA in favor of the plaintiffs.

## IV. Conclusion

For the foregoing reasons, the plaintiffs' Motion to Stay GRANTED. A separate order consistent with this decision accompanies this Opinion and Order.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge